**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | | |
| v. | ) | No. | 1:21-cr-28-14 (APM) |
| | ) | | |
| JOSEPH HACKETT, | ) | | |
| | ) | | |
| Defendant. | ) | | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
<u>MOTION FOR RECONSIDERATION OF CONDITIONS OF RELEASE</u>**

Defendant Joseph Hackett should remain detained pending trial.  Like his co-defendants Kelly Meggs (as "Gator 1") and Kenneth Harrelson (as "Gator 6"), Defendant Hackett (as "Ahab") was one of the leaders of the Florida group of Oath Keepers who organized and plotted with coconspirators to stop the certification of the Electoral College vote, prepared to use violence if necessary, and stormed the Capitol.  Defendant Hackett is a danger to the community based on his leadership role within the Oath Keepers, his provision of firearms to the Quick Reaction Force on January 6, his subsequent access to multiple firearms, and his extensive efforts to conceal his identity and his crimes.

For these reasons, the Court should maintain the order that the defendant be detained pending trial and deny the defendant's motion (ECF 321).

I.   <u>**Background**</u>

Video recorded on January 6, 2021, captured Defendant Hackett among a "stack" of more than a dozen individuals dressed in camouflaged para-military gear moving in a deliberate and organized manner toward the Capitol building.  An additional recording shows the stack moments later embedded near the front of a violent mob that is attempting to break open the doors of the Capitol building.  The video depicts the doors later opening and the subsequent flow of people into the building, including Defendant Hackett and members of the stack.  Cell phone and surveillance

video taken inside of the Capitol Rotunda further show Defendant Hackett's and his coconspirators' presence inside.

Co-defendant Jessica Watkins characterized their insurgent effort to breach the Capitol building as "forcing entry into the Capitol building" and said that it was "[f]orced. Like Rugby." On the evening of January 6, co-defendant Kelly Meggs wrote in a Signal chat, "Ok who gives a damn who went in there…. We are now the enemy of the State." An hour later, he continued: "We aren't quitting!! We are reloading!!"

Based on his actions described above, on May 26, 2021, a grand jury issued a fourth superseding indictment[1] charging Defendant Hackett with conspiracy, in violation of 18 U.S.C. § 371 (a felony); destruction of government property, in violation of 18 U.S.C. § 1361 (a felony); obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) (a felony); and entering a restricted building without lawful authority, in violation of 18 U.S.C. § 1752(a) (a misdemeanor). This Court contemporaneously issued a warrant for Defendant Hackett's arrest.

Two days later, on May 28, 2021, the FBI arrested Defendant Hackett in the Middle District of Florida. Pursuant to a warrant, the FBI also searched Defendant Hackett's house.

Later that day, Defendant Hackett had his initial appearance and detention hearing before Magistrate Judge Sean P. Flynn, in case 8:21-MJ-01527-SPF (M.D. Fla.). On the government's motion, Judge Flynn ordered Defendant Hackett detained pending trial.[2]

---

[1] On August 4, 2021, the grand jury issued a fifth superseding indictment, but the charges with respect to Defendant Hackett remain the same.

[2] Judge Flynn's detention order (ECF 9) is attached as Exhibit 1.

Judge Flynn found that the presumption of detention in Section 3142(e) applied, and that evaluating the factors under Section 3142(g) led to the conclusion that Defendant Hackett would be a danger to the community if released.  (5/28/21 Tr. at 28-31.)[3]

On August 9, 2021, Defendant Hackett filed the instant motion.

## II.     Legal Standard

### A.     Detention Hearing

Defendant Hackett moved for revocation of Magistrate Judge Flynn's detention order under Section 3145(b).  As the defendant indicates in his motion, the court's review is *de novo*. (ECF 321 at 2); *see also United States v. Munchel*, 991 F.3d 1273, 1280 & n.3 (D.C. Cir. 2021) (noting that Chief Judge Howell conducted a *de novo* review of a release order under Section 3145(a), and that district courts have "broad discretion" to review magistrate judges' detention decisions) (citation omitted).

Upon holding a detention hearing, the Court "shall order" a defendant detained if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  Here, there are no conditions that could assure the latter; in other words, releasing the defendant would present a "danger to the community."  *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).

"When the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community," the Supreme Court has explained, "a court may disable the arrestee from executing that threat."  *United States v. Salerno*, 481 U.S. 739, 751 (1987).  Notably, "the threat need not be of physical violence, and may extend

---

[3] The transcript of the detention hearing is attached as Exhibit 2.

to 'non-physical harms such as corrupting a union.'"  *Munchel*, 991 F.3d at 1283 (quoting *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988)).  "In assessing whether pretrial detention is warranted for dangerousness, the district court considers four statutory factors: (1) 'the nature and circumstances of the offense charged,' (2) 'the weight of the evidence against the person,' (3) 'the history and characteristics of the person,' and (4) 'the nature and seriousness of the danger to any person or the community that would be posed by the person's release.'"  *Id*. at 1279 (quoting 18 U.S.C. § 3142(g)).

At a detention hearing, the government may present evidence by way of a proffer.  *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

### B.    Application of Presumption and Factors To Be Considered

Defendant Hackett appears to concede that a presumption of detention applies.  (*See* ECF 321 at 5 (acknowledging a presumption of detention for co-defendant Watkins based on the same charge of violating Section 1361).)  The government submits that the subsection that provides the rebuttal presumption is Section 3142(e)(3)(C), as Section 3142(f)(1)(A) – which Defendant Hackett cites in his motion for this proposition (ECF 321 at 5) – provides the basis for a detention hearing in the first place.

The presumption arises if the offense – here, felony destruction of property under Section 1361 – is "listed in [S]ection 2332b(g)(5)(B)" and carries "a maximum term of imprisonment of 10 years or more."  The offense of felony destruction of property with which Defendant Hackett has been indicted is listed in section 2332b(g)(5)(B) and carries a maximum term of imprisonment of 10 years or more.  Therefore, the offense of felony destruction of property gives rise to the presumption of detention under Section 3142(e)(3)(C).  Moreover, and as discussed further below, the felony destruction of property in this case constitutes a "[f]ederal crime of terrorism" that was

calculated to influence or affect the conduct of government by intimidation or coercion (and is thus relevant to the detention decision under Section 3142(g)(1)).

Here, the government is not relying on the strength of the evidence as to the Section 1361 violation to support Defendant Hackett's detention. In fact, once the grand jury has found probable cause that Defendant Hackett violated Section 1361 (felony) – and here, it has – then under the guidance of *United States v. Singleton*, 182 F.3d 7, 12 (D.C. Cir. 1999), the government has satisfied its burden under Section 3142(f)[4] to trigger a detention analysis under Section 3142(g).

## III.    <u>Argument</u>

Defendant Hackett cannot rebut the presumption of detention under Section 3142(e)(3)(C). And the factors to be considered under Section 3142(g) support Defendant Hackett's continued detention.

### A.    **Defendant Hackett's Actions Show His Dangerousness.**

Defendant Hackett's leadership role, actions on January 6, access to firearms (including providing those firearms to the Quick Reaction Force on January 6), and efforts to conceal his identity and destroy evidence all point his to continued dangerousness.

#### 1.    **Leadership**

According to a defendant who has pled guilty pursuant to a cooperation plea agreement (and who will be referred to as D-1), Defendant Hackett was the "leader" of the Oath Keeper CPT[5] group of approximately five men from the Sarasota area. According to D-1, the organization's hierarchy had D-1 reporting to the CPT team leader (here, Hackett), who would report to the State lead (here, Kelly Meggs).

---

[4] The same rationale would apply to the detention analysis under Section 3142(e)(3)(C).

[5] D-1 did not know what CPT stood for, but other Oath Keeper materials suggest it stood for "community preparedness team."

Defendant Hackett's vetting form for the Florida chapter of the Oath Keepers – which the FBI located in his house when executing a search warrant – even shows him asking for a leadership role:



Defendant Hackett was of sufficient importance in the organization to be present for the November 9, 2020, GoToMeeting with Person One and other Oath Keeper leaders, including notably co-defendants Kelly Meggs, Harrelson, and Watkins.  (Fifth Superseding Indictment (ECF 328) ¶ 39.)  Defendant Hackett heard Person One make plans for the Oath Keepers in Washington, D.C., on January 6, 2021, and exhort the assembled, "We're going to defend the president, the duly elected president, and we call on him to do what needs to be done to save our country. Because if you don't guys, you're going to be in a bloody, bloody, civil war, and a bloody – you can call it an insurrection or you can call it a war or fight."  (*Id.*)

Finally, as explained more below, starting on December 19, 2020, Defendant Hackett was an "organizer" and no longer simply an "attendee" of the GoToMeetings preparing to come to Washington, D.C., including notably the "dc discussion and CPT teams" GoToMeeting that took place on December 23.

### 2.  Actions on January 6

Hackett outfitted himself on January 6 with tactical gear, including a plate carrier and helmet:



Defendant Hackett (blue circle) ascended the stairs on the east side of the Capitol just behind co-defendant Kelly Meggs (yellow circle), en route to linking up with co-defendant Harrelson (green circle):



Attached as Exhibit 3 is a compilation of Defendant Hackett's movements within the Capitol for the approximately 12 minutes he remained inside, as captured on surveillance video. Notably, he spent most of his time with his co-conspirators Kelly Meggs, Moerschel, and Harrelson.  At around 2:45 p.m., Defendant Hackett left the Rotunda through the south door, headed towards the House of Representatives (and the office of Speaker Pelosi).  This photo (which was later taken by the FBI as part of its investigation) shows the vantage point of a person in the vestibule near where these defendants had congregated:



Defendant Hackett was not visible on camera for approximately one minute.  He then went to check on the exterior doors through which the group entered, before returning to his co-conspirators south of the Rotunda, near the Speaker's office, where he remained, off camera, for approximately 5 minutes.  This is the area and the time that Kelly Meggs and Harrelson were similarly not visible on surveillance video.

The defendants' actions with respect to Speaker Pelosi were alarming, as explained in the government's detention memos for Kelly Meggs and Harrelson (ECF 98 and 152) and at the detention hearings for both co-defendants.   The government recently uncovered additional evidence about the intent of Kelly Meggs and Connie Meggs (and by extension, their co-conspirators): Very late on election night 2020, Kelly Meggs sent Connie Meggs the following message:



### 3. Firearms

Defendant Hackett trained with firearms, brought firearms to the Washington, D.C., area to have at the ready on January 6, and continued to store and hide firearms at his house at the time of his arrest.

#### a.    Training with high-powered firearms

In the fall of 2020, Defendant Hackett, wearing Oath Keepers garb, and along with co-defendants Kelly Meggs, Connie Meggs, and Kenneth Harrelson, participated in a "gunfight oriented training" with an AR-platform firearm.  (*See* Gov't Supp. Opp. to Defendants' Renewed Request for Release (ECF 106).)  With these three co-defendants, Defendant Hackett attended firearms training classes at this facility on at least September 20 and October 25, 2020.

A September 21, 2020, Instagram post depicts Defendant Hackett with his co-conspirators for one of those trainings:



### b.     Providing weapons to the Quick Reaction Force

According to a defendant who has pled guilty pursuant to a cooperation plea agreement (and who will be referred to as D-4), Defendant Hackett was one of the members of the Oath Keepers who deposited long guns at the Comfort Inn Ballston on January 5 and collected them on January 7.

Indeed, this still frame of surveillance video from the morning of January 7 shows Defendant Hackett pushing a concierge cart containing at least one rifle case:



### c.     Recovery of weapons at Defendant Hackett's house

During the execution of a search warrant at Defendant Hackett's residence, the FBI located seven long guns, including one AR-platform style firearm:



Elsewhere in the main part of the house, the FBI located a semi-automatic pistol and multiple additional magazines and boxes of ammunition.  And finally, hidden in a duffel bag in the attic, the FBI located two additional semi-automatic pistols and hundreds of rounds of ammunition:



### 4.   Efforts at Concealment

Defendant Hackett undertook some of the most advanced and sophisticated efforts to conceal his identity and his actions in advance of January 6, during the attack on the Capitol, and after January 6, including destroying evidence.

### a.      Monikers

Defendant Hackett used the name "John Willow" for his encrypted ProtonMail email address, through which he conducted his Oath Keepers business.[6]  He adopted the moniker "Ahab" to login to GoToMeeting and Signal to communicate with other Oath Keeper members.  And on the morning of January 7, between 9:12 and 9:35 a.m., after he had stormed the Capitol the day prior and retrieved his firearms earlier that morning, he logged onto Signal and changed his username from "Ahab" to "Faith":



---

[6] ProtonMail is a Swiss company that offers secure, encrypted email accounts.  (Fifth Superseding Indictment (ECF 328) ¶ 45.)

**b.**      **GoToMeeting / Virtual Private Network (VPN)**

When participating in GoToMeetings, Defendant Hackett used a VPN to obscure his identity.

Using the names "joe hackett" and "joe h" (before the election) and "ahab" (after the election), Defendant Hackett attended more than 20 Oath Keeper-related GoToMeetings, with meeting names like "ok florida," "ok national call," "ok intel call," and "dc discussion and cpt teams," in the fall and winter of 2020:



Tellingly, prior to the presidential election on November 3, 2020, Defendant Hackett often logged in using his own name or the moniker "joe h."  But starting in December 2020, he never logged in under his own name, and over the course of 16 meetings he always used the moniker "ahab."  Moreover, starting in late December, Defendant Hackett transitioned from being an "attendee" of these meetings to being an "organizer" of the meetings.  In this way, he followed a similar evolution as co-defendant Harrelson, transitioning from an attendee participating under his true name to an organizer using a moniker as the date of January 6 approached.

The records further show that, after the election, with only one exception, Defendant

Hackett logged into the meeting from a VPN.  A VPN would allow a user to obscure his participant city and true IP address.  On December 10, 2020, Defendant Hackett logged into a meeting with his true IP address (registered in his wife's name at his known address in Sarasota, Florida), but quickly logged out and logged back in with a VPN – apparently realizing his error.

<b>c.      Handwritten communications</b>

On December 19, 2020, Defendant Hackett, using his ProtonMail address, sent an email to a co-conspirator, with a subject line "test."  The body of the email stated: "I believe we only need to do this when important info is at hand like locations, identities, Ops planning."  The email had a photo attached; the photo showed cursive handwriting on a lined notepad that stated: "Secure Comms Test.  Good talk tonight guys!  Rally Point in Northern Port Charlotte at Grays if transportation is possible.  All proton mails.  May consider an RP that won't burn anyone.  Comms – work in progress.  Messages in cursive to eliminate digital reads.  Plans for recruitment and meetings."



During the execution of the search warrant at Defendant Hackett's house, the FBI similarly located a handwritten note about Oath Keepers vetting, with the apparent same cursive handwriting, suggesting that Defendant Hackett often communicated in this method:



### d.    Cell phone service / TextMe / Signal / burner phone

Defendant Hackett used an app on his iPhone called TextMe to further obscure his identity, and he had a flip phone (commonly referred to as a "burner" phone).

In late 2020 and early 2021, Defendant Hackett regularly used an iPhone 6S with service through AT&T.  (While his carrier was AT&T, his account was actually with a third-party reseller named TracFone.)  He also had an app on his iPhone called TextMe.  Using TextMe, a person can place phone calls and send texts through the app rather than using the carrier's network.

The defendants here frequently communicated using Signal, an end-to-end encrypted phone app.  (Fifth Superseding Indictment (ECF 328) ¶ 38(k).)  To use Signal, a person must have an associated phone number.  When accessing Signal, Defendant Hackett used his TextMe phone number (ending in 2509) rather than his AT&T phone number (ending 6396).  In other words, in addition to using a moniker on Signal ("ahab"), Defendant Hackett further obscured his identity by associating his TextMe account rather than a true phone number.  Further, Defendant Hackett's

TextMe account was not registered in his own name; it was simply registered with his "John Willow" ProtonMail email address.

Records suggest that Defendant Hackett deliberately turned off his iPhone – or, at a minimum, disabled cellular and WiFi service – while he was at the Capitol.  Indeed, according to AT&T's records, his phone's first phone call on January 6 occurred at 6:27 p.m. and no text messages were sent or received between 11:28 a.m. and 4:06 p.m.  According to TextMe's records, he had no phone calls or text messages on January 6.  While other members of the Florida Signal chat were regularly posting on January 6, Defendant Hackett did not post at all.

In other words, while Defendant Hackett had his phone with him at the Capitol – he is seen on surveillance video holding it up to take a picture or video, and he admitted to D-4 that he had recorded a video that he later deleted – he took substantial efforts to ensure that he would not be linked to the phone, and that the phone would not be linked to the Capitol attack.

Finally, when searching his house on May 28, 2021, the FBI located a Samsung flip phone that appeared to be a "burner" phone.

### e.   Physically shielding face

Defendant Hackett was much more scrupulous than others about shielding his face (and thus his identity).  On January 6, his efforts far exceeded wearing a mask common for Covid precautions:  he wore a gaiter that covered his nose, mouth, and chin, and sunglasses that covered his eyes.  In the area of the Ellipse, Hackett also wore a baseball cap:



And then on the steps of the Capitol, he had the same facial coverings, plus a helmet:



His efforts at obfuscation on January 7 were similar, covering almost his entire face (and now wearing a low baseball cap).  This is Hackett exiting the elevator at the Comfort Inn Ballston to collect the weapons:



And then returning to the elevator, pushing the concierge cart with the weapons, still with his face

almost completely covered:



From the government's review of the surveillance video and other videos and photos outside and inside the Capitol, and the surveillance video from the hotel, Defendant Hackett appears meticulous about not revealing his face to cameras.

### f.      Deleting videos

According to D-4, on January 7, 2021, while Defendant Hackett was in a car driving from Washington, D.C., to Florida, with co-defendant Kelly Meggs and others, he admitted that he had already deleted from his iPhone a video he had taken while inside the Capitol the prior day.

### g.      Destroying physical evidence

At the Capitol on January 6, as described above, Defendant Hackett was seen wearing a black Oath Keepers t-shirt, a checkered gaiter, a plate carrier with a prominent "Oath Keepers" logo, and a camouflaged helmet.  Despite a thorough search, the FBI did not locate any of those items at Defendant Hackett's house, suggesting that he hid or destroyed the physical items to prevent their recovery by the government.

## B.      The Section 3142(g) Factors Support Detention.

### 1.      Nature and circumstances of the offense.

This factor strongly supports detention, both because of the seriousness of the crimes for which Defendant Hackett has been indicted and the fact that he has been indicted on a federal crime of terrorism (Section 1361).

To show that the offense is a "[f]ederal crime of terrorism" to be considered as part of the "nature and circumstances of the offense" under Section 3142(g)(1), the government must meet both of Section 2332b(g)(5)'s prongs: (A) purpose of offense and (B) enumeration of offense.  The conduct of Defendant Hackett and his coconspirators – invading and temporarily taking over the national legislature while it was convening, pursuant to federal law, to formally count the ballots

20

for the presidential election – was clearly "calculated to influence or affect the conduct of government by intimidation or coercion" under Section 2332b(g)(5)(A). And because Section 1361 is enumerated in Section 2332b(g)(5)(B), the definition of "[f]ederal crime of terrorism" has been satisfied.

### 2. Weight of the evidence.

The weight of the evidence favors detention. Defendant Hackett and his co-conspirators are captured on surveillance video storming into the Capitol. Additionally, the government has recovered firearms, email messages, Signal communications, and financial records and other documents regarding Defendant Hackett's actions. Finally, multiple co-conspirators have pled guilty and provided information about Defendant Hackett (and other co-conspirators).

### 3. History and characteristics of the person.

This factor favors detention. The government acknowledges that Defendant Hackett is a professional with no criminal history. But his history in this case shows an important characteristic: he hides his true identity and takes actions to obstruct justice, by destroying evidence (both documentary evidence like the videos on his phone and physical evidence like the clothes and gear he had on January 6).

Other courts have held that a defendant's "lack of trustworthiness" and destruction of evidence support detention under Section 3142(f)(2). *See, e.g.*, *United States v. Djoko*, No. CR19-0146-JCC, 2019 WL 4849537, at *4 (W.D. Wash. Oct. 1, 2019) (holding that a defendant's "apparent willingness to destroy evidence and lie to authorities creates a serious risk that he may attempt to obstruct justice in some other way"). Indeed, in *United States v. Robertson*, 608 F. Supp. 2d 89, 92 (D.D.C. 2009), the court held that the defendants should be detained because their

release "would pose an unreasonable risk of obstruction of justice," based on their prior obstructive conduct.

### 4.   Seriousness of the danger to the community if released.

This factor strongly favors detention.  In *Munchel*, the D.C. Circuit was clear that defendants like Hackett – those "who aided, conspired with, planned, or coordinated" assaults on officers or the attack on the Capitol – have a heightened level of dangerousness from other January 6 defendants.  991 F.3d at 1284; *see also United States v. Hale-Cusanelli*, 3 F.4th 449, 456 (D.C. Cir. 2021) ("[W]e explained in *Munchel* that a person could be deemed a danger to the community sufficient to justify detention even without posing a threat of committing violence in the future.").  Indeed, the D.C. Circuit later cited this same language from *Munchel* to affirm detention decisions for January 6 defendants in *United States v. Sibick*, 848 F. App'x 442, 442 (D.C. Cir. 2021) (per curiam) (unpublished); *United States v. Worrell*, 848 F. App'x 5, 6 (D.C. Cir. 2021) (per curiam) (unpublished); and *United States v. Khater*, No. 21-3033 (D.C. Cir. July 26, 2021) (per curiam) (unpublished).[7]

In *Khater*, the D.C. Circuit noted that the defendant "contributed to the crowd's ability to breach the police line in front of the Capitol, and engaged in some level of prior planning and coordination."  Slip Op. at 2 (internal citation omitted).  The same is true here, as Defendant Hackett (with his co-conspirators) contributed to the crowd's ability to breach the east Rotunda doors and push past officers, as well as engaged in extensive prior planning and coordination.

In *Worrell*, the D.C. Circuit held that the "district court's dangerousness determination was [not] clearly erroneous," based in part on the defendant's "membership in and alleged coordination

---

[7]

https://www.cadc.uscourts.gov/internet/judgments.nsf/1D22490FE5567F8C8525871E00744687/$file/21-3033-1907769.pdf

with the Proud Boys, some of whose members have been indicted for conspiring to attack Congress." 848 F. App'x at 5-6.[8]  The same heightened dangerousness applies here, as the actions of self-proclaimed members of the Proud Boys and Oath Keepers are similarly situated in terms of their dangerousness based both on their personal actions and their coordination with their co-conspirators.  And not only have 18 Oath Keeper members and affiliates (Defendant Hackett included) been indicted in this case, but there is also evidence of coordination *between* the Oath Keepers and the Proud Boys.  (*See* Gov't Opp to Kelly Meggs' Motion for Pretrial Release (ECF 98) at 8 (quoting December 22, 2020, Facebook message: "we have made Contact with PB and they always have a big group")), and 10 (quoting December 25, 2020, Facebook message: "we have orchestrated a plan with the proud boys.  I have been communicating with [redacted] the leader.").)

## IV.    <u>CONCLUSION</u>

For all these reasons, the government submits that Defendant Hackett has not rebutted the presumption under Section 3142(e)(3)(C) that he be detained pretrial, as there are no conditions that will reasonably assure the safety of the community.  Defendant Hackett's motion should therefore be denied.

---

[8] Indeed, even in a recent order overturning a detention decision for a January 6 defendant, the D.C. Circuit noted that the defendant had "no ties to any extremist organizations."  *United States v. Tanios*, No. 21-3034 (D.C. Cir. Aug. 9, 2021) (per curiam) (unpublished), *at* https://www.cadc.uscourts.gov/internet/judgments.nsf/E216BF3BAA3450E58525872D000508D 3/$file/21-3034-1909636.pdf.  The same cannot be said for Defendant Hackett.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY

By:

Jeffrey S. Nestler
Assistant United States Attorney
D.C. Bar No. 978296
Ahmed M. Baset
Troy A. Edwards, Jr.
Jeffrey S. Nestler
Kathryn Rakoczy
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530


*/s/ Alexandra Hughes*
Alexandra Hughes
Justin Sher
Trial Attorneys
National Security Division
United States Department of Justice
950 Pennsylvania Avenue
NW Washington, D.C. 20004